239 So.2d 442 (1970)
CLAY-DUTTON, INC.
v.
PLANTATION NURSING HOME OF NEW ORLEANS, INC. and Betty A. Maloney.
No. 3797.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1970.
Rehearing Denied October 5, 1970.
*444 Salomon & Rudman, I. Bernard Salomon, Laurence D. Rudman, New Orleans, for Clay-Dutton, Inc.
Floyd J. Reed and Forrest L. Bethay, Reed, Reed & Reed, New Orleans, of counsel for Plantation Nursing Home of New Orleans, Inc., and Betty A. Maloney.
Before REGAN, CHASEZ and BARNETTE, JJ.
CHASEZ, Judge.
This is an appeal from a jury verdict in favor of plaintiff Clay-Dutton, Inc. and against defendants, Plantation Nursing Home of New Orleans, Inc., and Betty A. Maloney, severally and in solido, in the sum of $1,358.60, plus 8% interest from date of judicial demand until paid, 25% attorneys' fees and for all costs.
Plaintiff's petition was styled CLAIM ON LEASE AND MAINTENANCE AGREEMENT, and arose from a dispute over the lease of a 1966 Lincoln Continental. The lease was entered into between the parties on November 16, 1965 and was to run for a minimum term of 36 months and a maximum term of 53 months. For the first 36 months the total monthly payment was to be $175.47, from the 37th to the 48th month the payment would be $137.20 and from the 49th to the 53rd month, $124.62. The lessee was granted the privilege of terminating the lease at any point after the earliest termination date, the 36th month. There was a termination value placed on the car of $2,160.00, the termination value being the value of the car at the earliest termination date, the 36th month. This figure was determined by calculating the depreciation based on National Automobile Dealer's Association guidelines. According to the terms of the lease, if the lessee chose to terminate the lease at the end of 36 months the lessor could take the car back and sell it to the highest bidder at private sale. If the price obtained for the automobile exceeded the termination value of $2,160.00, the difference between $2,160.00 and the price obtained would be returned to the lessee as a rebate, unless she was found in default under the terms of the lease. However, if the price obtained was less than $2,160.00, then the lessee was obliged to pay the lessor the difference between the sale price and $2,160.00.
Under paragraph five of the lease, if the lessee cancelled the lease prior to the earliest termination date then a formula was used by which the lessee would either be credited or charged for the termination value of $2,160.00, plus the sum of a figure referred to as the monthly cancellation factor ($133.24) multiplied by the number of months remaining between the actual cancellation date and the earliest cancellation date provided for in the lease  36 months.
In either instance, termination of the lease at the end of 36 months of cancellation of the lease prior to that time, whether voluntarily by lessee or through his default, the lessor by the terms of the lease was allowed to take possession of the automobile, sell it at private sale and collect the deficiency from the lessee if the car did not bring the price reached through the above described formulas.
In the present case the car was returned to Clay-Dutton when there remained a period of 15 months in the term of the lease. Applying the formula set forth in the lease, the lessee owed Clay-Dutton, Inc. the termination value of $2,160.00 plus the cancellation factor of $133.24 multiplied by 15, or $2,160.00 plus $1,889.60, which amounts to $4,158.60, less the price obtained by selling the car, $2,800.00, or a total of $1,358.60. This amount is denoted by the lease to be additional rentals. From this amount awarded by the jury, defendants have appealed.
*445 The pertinent clauses of the lease are numbers (5) and (18) and are as follows:
"5. TERMINATION AND CANCELLATION PRIVILEGES. Lessee may terminate the lease of any vehicle at any time after the Earliest Termination Date specified at A in the Termination Section of the Rental Schedule for such vehicle, or if circumstances should indicate the necessity or desirability of such action, Lessee may cancel the lease of any vehicle at any time after three (3) months from the date of delivery of same, and prior to the Earliest Termination Date provided Lessee at such time shall (a) not be in default hereunder; (b) have given Lessor thirty (30) days advance notice in writing of such intent; (c) have returned the motor vehicle to Lessor at the Return Place specified at 7 in the Rental Schedule therefor; (d) have paid to Lessor all of the rentals and any other charges accruing upon such vehicle up to the date of return of such vehicle; and (e) pay to Lessor the additional rental charge as hereinafter provided, if any, at the time of such termination or cancellation.
"Upon receipt of the vehicle, Lessor will offer it for sale for cash or, in its discretion, offer to credit Lessee as if such vehicle had been sold for cash, subject to approval of the net amount of such selling price or credit by Lessee. Lessor will advise Lessee of the highest verbal or written net offer received and will, for a period not to exceed fourteen (14) days, sell, or credit Lessee, only for an amount approved by Lessee. If Lessee fails to approve any offer during such fourteen day period, Lessor may at any time thereafter, in its discretion sell the vehicle for the highest net cash offer then available. Upon termination or cancellation by Lessee, Lessor will credit or charge Lessee the difference between:
"(i) The Net proceeds from the sale of such vehicle or from the involuntary conversion thereof in the instances hereinafter specified in paragraph 11 of this agreement or the agreed credit therefor; and
"(ii) If Terminated, the amount specified at B in the Termination Section of the annexed Rental Schedule applicable to such vehicle less the sum of the Monthly Adjustment Factor specified at C in said Termination Section for the number of months the vehicle shall have been leased after the passing of the Earliest Termination Date specified at A in said Termination Section and up to the date of return of the vehicle to Lessor or to the date of receipt of the proceeds from involuntary conversion thereof.
"(iii) If Cancelled, the amount specified at D in the Cancellation Section of the annexed Rental Schedule applicable in such motor vehicle plus the sum of the Monthly Cancellation Factor specified at E in said Cancellation Section for the number of months remaining from the date of return of such vehicle to Lessor or from the date of receipt of the proceeds from involuntary conversion thereof up to the Earliest Termination Date specified at A in the Termination Section of such Rental Schedule.
"If the amount of such proceeds of sale or involuntary conversion, or credit given by Lessor in lieu thereof specified as (i) above shall exceed the amount specified as (ii) above, if terminated, or as (iii) above, if cancelled, Lessor will pay the amount of such excess to Lessee, if Lessee is not in default hereunder, as either a Termination or Cancellation rental rebate, as the case may be; but, if such proceeds shall be less, then Lessee shall pay such difference to Lessor as additional rental hereunder. Payment of such rental rebate shall be paid to Lessee within ten (10) days after receipt of such proceeds by Lessor and payment of such additional rental will be paid to Lessor by Lessee within ten (10) days after receipt of Lessor's billing therefor. This lease shall not be considered either Terminated or Cancelled unless and until the amount of the additional rental billed to Lessee has been paid to Lessor and all of Lessor's remedies hereunder shall continue until so paid.
*446 The various Monthly Adjustment Factors and the Cancellation Factor specified on the Rental Schedule shall be pro-rated in accordance with the number of elapsed days during the month in which the Termination or Cancellation shall become effective as specified herein."
"18. DEFAULT. If Lessee shall default in the payment of any installment due and owing under the terms of this agreement, or any other sum or reimbursement payable to Lessor hereunder and such default shall continue for more than ten (10) days after Lessor shall have demanded payment thereof, or shall fail or refuse to perform any other provision hereof to be performed by Lessee, or if a petition under any bankruptcy law shall be filed by or against Lessee or Lessee shall make any assignment for the benefit of creditors or Lessee shall suffer or permit the appointment of any trustee or receiver for Lessee's business or assets or any part thereof or Lessee shall make or suffer any assignment, voluntary or involuntary, of Lessee's interest in any vehicle included in this lease or suffer any lien, attachment or levy of execution to become attached hereto (unless such petition, assignment, appointment, lien, attachment, or levy be withdrawn or nullified within twenty (20) days); then, in any event, Lessor may, at Lessor's option, by written notice to Lessee, terminate this lease. Upon any such termination, Lessor, at its election, may (a) declare immediately due and payable, and Lessee shall pay the rent then unpaid for the balance of the Lease Term for any or all vehicles leased hereunder that Lessor or the assignee of any such vehicles so in default may request; or (b) take possession of any or all vehicles leased hereunder and (i) terminate all or any of the several leases and all the rights of Lessee to any or all vehicles leased thereunder; or (ii) sell any or all of such vehicles as provided in paragraph 5 hereof, and collect from Lessee as additional rental, any deficiency in the proceeds of such sales; or (iii) without terminating this lease of the Lessee's obligation hereunder, lease any or all thereof for the account of Lessee, applying such rentals to Lessee's rentals due hereunder, holding Lessee responsible for any deficiency therein. Lessee waives all claims for damages because of entry or taking possession upon default by Lessee. No remedy is exclusive of another. If Lessor be in default as to any vehicle, Lessee may not terminate the lease of any other vehicle except as provided in Paragraph 5 hereof. Lessee is herewith bound to pay the fees of any attorney at law who may be employed to recover any amount due hereunder or to protect the interest of Lessor or any Assignee hereof, or to compromise or to take other action with regard hereto, which fees are hereby fixed at twenty-five (25%) per centum of the amount then due and owing and sought to be collected, or preserved, and in no case shall said fee be less than $100.00. The rights and remedies of Lessor in the event of default herein mentioned shall not be deemed exclusive, but shall be cumulative and in addition to all other rights and remedies in Lessor's favor existing by law."
On December 24, 1969 the defendants-appellants filed a peremptory exception of no cause of action in this court in which they stated that they rely on the recent decision of Clay-Dutton, Inc. v. Coleman, La.App., 219 So.2d 307 (1st Cir.1969), and pray that the court dismiss the demands of the plaintiff, Clay-Dutton, Inc., against the defendants.
Since it appears that the defendants-appellants, by this exception and the briefs filed, primarily rely upon the rationale of the Coleman case, we shall treat this defense first.
A lease with substantially the same provisions as those contained in the lease at issue herein set forth above, was considered in the Coleman case. In that case the court held that the Deficiency Judgment *447 Act was applicable to the termination and cancellation provisions of the lease, but that the act had been violated because the leased property had been sold without benefit of appraisement. In addition, the court held that the sums denominated in the contract as "additional rentals" were "future rentals" and could not be collected.
The reasoning of the First Circuit Court was succinctly stated at page 312 of that opinion as follows:
"The provisions of the lease contract quoted extensively hereinabove make frequent reference to `additional rental'. It is abundantly clear to us that under the very terms of this lease plaintiff is now endeavoring to collect `future rentals'. Whether future rentals are declared `additional rental' or the sums sought are computed under any other formula said sums still remain future rentals and cannot be collected after the termination of the original contract unless there is first obtained a judgment in favor of the lessor accelerating the rentals due under the contract and the lessor then seizes the lessee's rights under the lease. This procedure of necessity requires a judicial process and is a condition precedent to obtaining a deficiency judgment.
"This in our opinion is the logical interpretation of those provisions of LRS 13:4106-4107 which specifically refers to `contracts, debts or other obligations'.
"A perusal of the lease agreement offers ample proof that paragraphs 5 and 18 have for their express purpose the elimination of a judicial process which requires sale with appraisement as a requisite to a claim for any deficiency."
Appellee contends in this court that the Deficiency Judgment Act is inapplicable because, "[T]his obligation is assumed by the Lessee at the inception of the lease, as part of the consideration for the lease, and is due to be paid by him regardless of when the lease is terminated or cancelled." Appellee is in effect arguing that the parties are free to make their own contracts and such contracts are the law as between the parties. This is true as long as the contract does not contravene good morals or public policy.
Appellants urge that the court render judgment in their favor under the rationale of the Coleman case. Unfortunately, however, we are unable to reach the same conclusion as did our brothers on the First Circuit Court.
The Deficiency Judgment Act reads as follows:
"Deficiency judgment prohibited if sale made without appraisement.

"If a mortgagee or other creditor, takes advantage of a waiver of appraisement of his property, movable, immovable, or both, by a debtor, and the proceeds of the judicial sale thereof are insufficient to satisfy the debt for which the property was sold, the debt nevertheless shall stand fully satisfied and discharged insofar as it constitutes a personal obligation of the debtor. The mortgagee or other creditor shall not have a right thereafter to proceed against the debtor or any of his other property for such deficiency, except as provided in the next paragraph.
If a mortgage or pledge affects two or more properties, movable, immovable, or both, the judicial sale of any property so affected without appraisement shall not prevent the enforcement of the mortgage or pledge in rem against any other property affected thereby. As amended Acts 1952, No. 20, § 1; Acts 1960, No. 32, § 1." (Emphasis supplied)
R.S.-LSA 13:4107 provides:
"R.S. 13:4106 cannot be waived; operation prospective.
"R.S. 13:4106 declares a public policy and the provisions thereof can not, and shall not be waived by a debtor, but it *448 shall only apply to mortgages, contracts, debts or other obligations made, or arising on or after August 1, 1934."
R.S. 13:4106, 4107 were passed for the protection of the debtor whose property was seized and sold by his creditor to satisfy an obligation. These statutes are found under the executory process section of the revised statutes and contemplate a disposal of the debtor's property by judicial sale before their provisions come into operation.
The literal wording of this act has, however, been extended by a line of jurisprudence which includes Atlas Finance Corporation v. Whitehead, La.App., 99 So.2d 481 (Orleans 1958); Universal C. I. T. Credit Corp. v. Hulett, La.App., 151 So.2d 705 (3rd Cir. 1963); Shreveport Auto Finance Corp. v. Harrington, La.App., 113 So.2d 476; (2nd Cir.1959); and David Investment Company v. Wright, La.App., 89 So.2d 442 (1st Cir.1956). By judicial interpretation R.S. 13:4106 applies to private sales as well as judicial sales when a debtor's property is sold without benefit of appraisement.
However in the case at bar one of the prime requisites necessary before the Deficiency Judgment Act becomes applicable is not present. The property which has been sold and for which a deficiency is being sued is the property of the creditor and not of the debtor. Defendant had possession of the automobile by virtue of a contract of lease. Title to the car always remained in Clay-Dutton, Inc. There was never a sale of the vehicle by Clay-Dutton, Inc. to Mrs. Maloney or Plantation Nursing Homes. R.S. 13:4106 specifically states that if the debtor waives appraisement of his own property, the act becomes applicable. It does not regulate the situation presently before the court where the debtor has waived appraisal of the creditor's asset. Therefore the Deficiency Judgment Statutes relied on by defendants-appellants are not applicable here.
Having decided that the Deficiency Judgment Act is inapplicable in this matter, we look to the provisions of the contract of lease itself to determine the rights of the parties. The consideration for a contract of lease is the use of the object by one party and the payment of rent by the other. The question for determination by this court is whether or not the amount Clay-Dutton is attempting to collect from the defendant constitutes rental monies. If they are future rentals as found in Coleman, then they may not be assessed against defendant because defendant may not be charged rental after being deprived of the use of the leased object.
While the lease contract seems to denominate the amount sought to be collected as "additional rent", a closer look at the agreement between the parties, the manner in which plaintiffs' claim arises, the amount sought and the basis on which it is to be paid convinces us that rental payments are not involved at all. Instead defendants-appellants are being required to pay an amount for which they agreed to be responsible at the inception of the lease upon the occurrence of a certain event, i. e. the termination or cancellation of the lease. They obligated themselves under the terms of the lease to pay the amount claimed by plaintiff-appellee in the event of termination or cancellation of the lease and such agreement forms part of the overall consideration of the contract. Therefore the payment of the sum sought herein is not payment of rent, but the performance of a contractual obligation freely accepted and agreed to by defendants-appellants, and is owed by them regardless of the reason for the termination or cancellation of the lease; it is the happening of that event alone in the manner in which it occurred which caused the claim of Clay-Dutton, Inc. to become due simply because the parties so provided in their contract. Mossy Enterprises, Inc. v. Piggy-Bak Cartage Corp., La.App., 177 So.2d 406 (4th Cir. 1965).
*449 The evidence adduced in this case supports the conclusion that Mrs. Maloney and Plantation Nursing Home of New Orleans, Inc. were in default on their lease agreement. They made no monthly payments of rent after July of 1967. They evidently felt that since the car was not running properly they were under no obligation to make the monthly payments. However, under the service agreement they were responsible for repairs after the automobile had accumulated more than 24,000 miles. Evidence in the form of a repair order introduced by Clay-Dutton shows that on August 7, 1967 there was 46,566 miles showing on the speedometer. It cannot seriously be doubted then that the responsibility for making the repairs in August of 1967 rested with Mrs. Maloney. She was mistaken in her assumption that Clay-Dutton should make the repairs. Therefore, this court concludes that defendants-appellants had no valid basis for discontinuing the monthly rental payments on the car; Clay-Dutton was justified in reclaiming possession of the car and cancelling the lease which it did in November or December of 1967.
Plantation Nursing Home of New Orleans, Inc. was given notice that the lease was cancelled on January 4, 1968; that the cancellation value of the automobile as of that day was $4,158.00; that it had fourteen days within which to take some action or the car would be sold for $2,800.00; and that if it did nothing, legal process would be instituted against it to collect the balance of $1,358.00. Defendants-appellants took no action and the car was sold at private sale on March 8, 1968 and suit was then brought against Mrs. Maloney to collect that $1,358.00.
With regard to the reconventional demand filed by appellants, this court finds from the evidence, as did the jury, that such demands were not proven and should be dismissed. The court a quo apparently concurred in this decision by its denial of a new trial. Mrs. Maloney and Plantation Nursing Home of New Orleans, Inc. alleged in their reconventional demand that Clay-Dutton, Inc. breached its contract by deliberately failing to properly repair the automobile when it was brought to their service department for this purpose while the 24,000 mile maintenance agreement was in effect. However, the court finds no credible evidence in the record to sustain this allegation. In addition, Mrs. Maloney and Plantation Nursing Home further alleged that a tender of the car was made to Clay-Dutton, Inc. prior to the time that the car had been driven 24,000 miles, in other words, during the period Clay-Dutton, Inc. was responsible for repairs under the terms of the maintenance agreement. However, the court is of the opinion that this allegation has not been sustained but that to the contrary the lease remained in effect, both parties accepting mutual benefits under its terms, until January 4, 1968 when Clay-Dutton, Inc. sent Plantation Nursing Home of New Orleans, Inc. its notice of cancellation.
As part of their reconventional demand, defendants-appellants itemized a claim for $2,500.00 damages for "worry and inconvenience, harassment, mental anguish and humiliation". With regard to this claim, the judge made the following charge to the jury:
"Damages have been claimed in the matter for harassment, for mental anguish. There are no damages in Louisiana allowed for mental anguish to the breach of a contract."
While this charge may appear to be erroneous under the cases of Jack v. Henry, La.App., 128 So.2d 62 (1st Cir. 1961); Melson v. Woodruff, La.App., 23 So.2d 364 (1st Cir.1945); and Meyer v. Succession of McClellan, La.App., 30 So.2d 788 (Orleans 1947), we do not think it necessary to remand the case on this ground. It is well settled that when an appellate court has all the facts before it, an inconsequential error in a trial judge's instructions to the jury does not warrant *450 a remand. Barreca v. United States Fire Insurance Co., La.App., 182 So.2d 138 (4th Cir. 1966); Duet v. Montagnet, La.App., 169 So.2d 561 (4th Cir.1964). The evidence presented by the record convinces us that it was never necessary for the jury to pass on the question of whether or not Mrs. Maloney or Plantation Nursing Home of New Orleans, Inc. suffered damages for mental anguish. The plaintiffs in reconvention did not first prove a breach of contract by Clay-Dutton, Inc. and therefore whether they suffered mental anguish or not is immaterial.
The claim for attorneys' fees for having to defend a suit filed against defendants-appellants in the First City Court of New Orleans by Clay-Dutton, Inc. has no merit. Accordingly, this claim, like all others in reconvention, will be denied.
For the reasons hereinabove set forth, it is ordered, adjudged and decreed that the exception of no cause of action filed in this court by Plantation Nursing Home of New Orleans, Inc., and Mrs. Betty A. Maloney against Clay-Dutton, Inc., be and the same is hereby overruled.
And it is further ordered, adjudged and decreed that the judgment rendered herein by the Court a quo in favor of Clay-Dutton, Inc., and against defendants-appellants, Plantation Nursing Home of New Orleans, Inc. and Mrs. Betty A. Maloney jointly, severally and in solido for the full sum of $1,358.60, together with 8% interest thereon from date of judicial demand until paid and all court costs, is affirmed. And further the judgment of the Court a quo dismissing all other demands filed by Plantation Nursing Home of New Orleans, Inc. and Mrs. Betty A. Maloney against Clay-Dutton, Inc., particularly the reconventional demand filed and tried herein is likewise affirmed. All costs of this court shall be borne by Plantation Nursing Home of New Orleans, Inc. and Mrs. Betty A. Maloney.
Affirmed.
REGAN, Judge (concurring).
I agree with the result reached by the majority herein. However, in view of the conflict which exists as a result of the rationale of this opinion and that emanating from the case of Clay-Dutton, Inc. v. Coleman[1] I am convinced that supervisory writs should be granted for the purpose of eliminating the disagreement between the First and Fourth Circuits.
NOTES
[1] La.App., 219 So.2d 307 (1st Cir. 1969).